UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:13-cr-00051-JAW |
| | ) | |
| STEPHANIE L. McCORMICK | ) | |

**SENTENCING ORDER**

After resolving numerous factual disputes based on a stipulated record, the Court concludes that Stephanie McCormick was an organizer, leader, manager, or supervisor of other participants in the commission of a Hobbs Act robbery of a pharmacy and is subject to a two-level enhancement under United States Sentencing Commission Guideline (USSG) § 3B1.1(c).

I.    **BACKGROUND**

A.    **Procedural Background**

On March 21, 2013, Stephanie McCormick waived indictment and pleaded guilty to an information charging her with aiding and abetting interference with commerce by robbery, a violation of the Hobbs Act, 18 U.S.C. § 1951. *Waiver of an Indictment* (ECF No. 25); *Information* (ECF No. 26); *Minute Entry* (ECF No. 30). Upon the completion of the Presentence Report (PSR), the Government filed a memorandum in aid of sentencing on June 26, 2013 with a set of sentencing exhibits. *Gov't Mem. in Aid of Sentencing* (ECF No. 33) (*Gov't Mem.*); *Gov't Ex. List* (ECF No. 34). Ms. McCormick responded on July 16, 2013. *Def. Stephanie McCormick's Sentencing Mem.* (ECF No. 38) (*Def.'s Resp.*). The Government replied

on July 23, 2013.  *Gov't's Resp. to Def.'s Mem. in Aid of Sentencing* (ECF No. 40) (*Gov't's Reply*); *Gov't's Am. Ex. List* (ECF No. 39).

Ms. McCormick objected to two of the exhibits that the Government attached to its reply and moved to strike them.  *Def. Stephanie McCormick's Mot. to Strike Gov't Exs. G & H* (ECF No. 41).  On August 20, 2013, the Court issued an order, denying the motion to strike the exhibits but allowing Ms. McCormick to file a sur-reply to address any new issues presented by the recently-filed Government exhibits.  *Order Denying Def.'s Mot. to Strike Exs.* (ECF No. 45).  On August 29, 2013, Ms. McCormick filed a sur-reply.  *Def. Stephanie McCormick's Sur-reply to the Gov't's Resp. to Def.'s Mem. in Aid of Sentencing* (ECF No. 46) (*Def.'s Sur-reply*).

### B.    Guideline Impact

The Probation Office calculated Ms. McCormick's Guideline range by starting with the base offense level of 20, imposing a two-level increase because a threat of death was made, adding a one-level increase because a controlled substance was taken, and applying a three-level reduction because of her acceptance of responsibility, resulting in a total offense level of twenty.  *Presentence Report* at 5 (PSR).  With a criminal history category of I and a total offense level of 20, the Guideline range for imprisonment is 33 to 41 months under this offense level calculation.  *Id.* at 8, 13.  Ms. McCormick would not be eligible for probation, the Guideline range for supervised release would be 1 to 3 years, the fine range $7,500 to $75,000, and restitution and a special assessment would be mandatory in the amount of $1,587.51 and $100, respectively.  *Id.* at 13-14.  If a two-level leadership

2

enhancement is imposed under § 3B1.1(c), the total offense level would increase to 22, the criminal history category would be unchanged, and the Guideline range for imprisonment would increase to 41 to 51 months. The remaining penalties would be unchanged.

### C.   Factual Overview

#### 1.   The Prosecution Version[1]

##### a.   January 22, 2013: Anthony Post Robs CVS Pharmacy

On Tuesday, January 22, 2013, Anthony Post, a nineteen year old male, entered a Walgreen Pharmacy in Augusta, Maine, wearing a winter jacket but not his prescription eyeglasses nor any mask or hat. *Prosecution Version* at 1 (ECF No. 29) (*Prosecution Version*). He stayed a few minutes and left; his entrance and departure were captured on the Walgreen's store video. *Id.*

About fifteen minutes later, Mr. Post entered a nearby CVS Pharmacy in Augusta, wearing the same jacket, a ski hat with ear muffs, a scarf across his face, and prescription sunglasses. *Id.* A store video captured his image. *Id.* This time Mr. Post waited in the store while a pharmacy customer was being waited on, approached the pharmacy tech, and presented the tech with a note that read: "Quickly & Calmly put All oxycodone in a bag If not I have A gun & will start shooting No Scene!" *Id.* In fact, he did not possess or use a firearm. *Id.* The tech

---

[1]   At the Rule 11 hearing, Ms. McCormick admitted that the contents of the Prosecution Version were true. *Minute Entry* (ECF No. 37). In addition to the Prosecution Version, the Government submitted eight sentencing exhibits, A through H, consisting of four narrative reports regarding the CVS robbery, Anthony Post's Proffer, C.P.'s Proffer, Candice Eaton's Proffer, and a photocopy of the demand note. *Gov't Am. Ex. List* (ECF No. 39).

passed the note to the pharmacist who filled a bag with oxycodone (200 5 milligram (mg) pills, 113 15 mg pills, and 279 30 mg pills) and with a GPS tracking device. *Id.* at 1-2. The GPS device was followed to a nearby intersection where it had been thrown into a parking lot; more empty oxycodone bottles were found along the road. *Id.* at 2.

The next day, photographs from both stores were published online and in various media and shortly thereafter, two persons who knew Mr. Post very well called the city of Augusta Police Department and informed them that Anthony Post was the person depicted in the images. *Id.* The police located Mr. Post. *Id.*

> **b.   January 20-22, 2013: Anthony Post, Stephanie McCormick, Candice Eaton and C.P. and Events Leading Up to the CVS Robbery**

Anthony Post is Stephanie McCormick's cousin. *Id.* He had been at her apartment since Sunday, January 20, 2013, and she had asked him whether he wanted to get high and whether he had ever "shot up" before. *Id.* Mr. Post responded that he had not shot up and he did not want drugs in his system because he was on pre-release. *Id.* Ms. McCormick told him that the drugs would be out of his system in two days and she injected him with a portion of a 30 mg oxycodone pill. *Id.*

On Monday, January 21, 2013, after Ms. McCormick and Mr. Post awoke, she told him that she was "sick," undergoing withdrawal symptoms. *Id.* Ms. McCormick contacted a woman and the three of them drove to a place to buy pills. *Id.* Ms. McCormick took the woman's money and bought some pills, but both she

and Mr. Post took off without turning the pills over to the woman. *Id.* Ms. McCormick and Mr. Post returned to Ms. McCormick's apartment, where they shot up again. *Id.*

On Tuesday, January 22, 2013, Ms. McCormick and Mr. Post again awoke feeling sick. *Id.* Ms. McCormick sent text messages looking for someone she and Mr. Post could "rip off." *Id.* Unsuccessful, Ms. McCormick told Mr. Post that he could get away with robbing a local pharmacy because he was not from the area and very few people knew him. *Id.* at 3. Ms. McCormick told Mr. Post that all he needed to do was cover his face and pass a note over the counter of the pharmacy. *Id.*

Ms. McCormick and Mr. Post devised a plan for him to rob the nearby Walgreen's Pharmacy. *Id.* Mr. Post was to walk to the Walgreen's, rob it, and run back to Ms. McCormick's apartment with the pills. *Id.* Except for Mr. Post's jeans and shoes, Ms. McCormick provided Mr. Post with the clothing he wore during the proposed robbery and she wrote out a demand note.[2] *Id.* Mr. Post went to the Walgreen's but could not get up the nerve to commit the robbery and, once confronted by the pharmacist, he left. *Id.*

Ms. McCormick suggested that they try and rob the CVS and Mr. Post agreed. *Id.* Ms. McCormick called someone to see if he would be willing to drive herself and Mr. Post to rob CVS, but the person was unwilling to do so. *Id.* Ms. McCormick then called Candice Eaton, who told her she would not help, but after

---

[2]     Ms. McCormick admitted writing out the note, except for the part that said, "start shooting." *Prosecution Version* at 5.

Ms. McCormick called her again and promised her a "30," Ms. Eaton agreed to help rob the CVS. *Id.*

A short time later, Ms. Eaton and her friend, C.P., picked up Ms. McCormick and Mr. Post and the four of them drove to the Arsenal Street area in Augusta and they dropped off Mr. Post under the Memorial Bridge. *Id.* Mr. Post then walked to CVS, handed over the note that Ms. McCormick had written, was given the oxycodone, and ran back to the Eaton vehicle where the three others were waiting. *Id.*

### c. January 22-24, 2013: Anthony Post, Stephanie McCormick, Candice Eaton and C.P. and Events Following the CVS Robbery

Once Mr. Post got in the Eaton vehicle, Ms. McCormick instructed him to duck down and she took all the pills, emptied them into the CVS bag, and threw the bottles out of the window, including the bottle with the GPS tracker. *Id.* They drove to a boat launch where Ms. Eaton, Mr. Post, and Ms. McCormick began shooting up. *Id.*

They then went to an apartment where Ms. Eaton and C.P. had been staying and they divided up the stolen pills. *Id.* at 3-4. Mr. Post stated that he sold two of the pills to a man who came to the apartment and gave half of the money for the sale and the rest of his share to Ms. McCormick to sell for money because he just wanted money. *Id.* at 4. The four then spent the night at a residence in Richmond where all but C.P. continued to use the drugs. *Id.* The next day, Mr. Post was dropped off in Gardiner and Ms. McCormick gave him $20 for cab fare. *Id.*

### 2. Anthony Post's February 25, 2013 Proffer

Anthony Post proffered to the Federal Bureau of Investigation at the United States Attorney's Office on February 25, 2013. *Gov't's Ex.* B (ECF No. 39) (*Post Proffer*). As of January 2013, Mr. Post, who was nineteen years old at the time of the CVS robbery, had been living in Lewiston, Maine and was on pretrial release for a burglary in Auburn, Maine. *Id.* at 1. As a condition of pretrial release, he was ordered to live with his father in Lewiston. *Id.* On Friday, January 18, 2013, Mr. Post hitchhiked to Augusta, Maine to visit his girlfriend, Tina. *Id.* Mr. Post has a history of substance abuse, including alcohol, marijuana, and pain killers, but he had been clean for fifty-five to sixty days when he visited Tina. *Id.* Following the Auburn robbery, he had been incarcerated for thirty days and upon release, he had taken advantage of the period of forced sobriety and had remained clean. *Id.* He and Tina did not use any drugs that weekend. *Id.*

On Sunday, Mr. Post left to return to Lewiston, but he realized that because Monday was a holiday, he would not have to check-in on pretrial release until Tuesday, January 22. *Id.* He decided to visit his cousin, Stephanie McCormick, and her mother, Kimberly McIntyre, in Augusta. *Id.* Mr. Post was aware that Ms. McCormick and her family have had problems with drug abuse, but he had never actually seen Ms. McCormick in possession of or using drugs. *Id.* Mr. Post's plan was just to stop by, say "hi," and return to Lewiston. *Id.* When Mr. Post arrived at Ms. McCormick's apartment, Ms. McIntyre and Ms. McCormick were standing outside their residence smoking. *Id.* Ms. McIntyre and Ms. McCormick invited Mr.

Post to come with them to Target to buy Ms. McCormick a new phone and he agreed to go along. *Id.* at 2. While on the way to Target, Ms. McCormick asked Mr. Post whether he wanted to spend the night with them and he agreed to do so. *Id.*

While at Target, Ms. McCormick received a text message from an unidentified person, asking her to help obtain some oxycodone pills. *Id.* This person promised Ms. McCormick a "30," meaning a 30 mg oxycodone pill to do the drug deal for him. *Id.* Ms. McCormick either called or texted a known drug dealer and made arrangements for the unidentified person and the drug dealer to meet in the Target parking lot to complete the drug deal. *Id.* The drug-seeking person arrived at Target and Ms. McCormick, Mr. Post, and the drug-seeker went out to the Target parking lot. *Id.* When the drug dealer arrived, Ms. McCormick got into the drug dealer's car and emerged with pills; after handing the pills to the drug seeker, Ms. McCormick got money from him and returned to the drug dealer's car to complete the deal. *Id.* Ms. McCormick returned to Target, found her mother, and the three of them proceeded back to the McIntyre/McCormick apartment. *Id.*

Once back in the apartment, Ms. McCormick asked Mr. Post whether he wanted to get high with the 30 mg pill that she had received for brokering the drug deal. *Id.* Mr. Post initially declined and told Ms. McCormick that he was on pretrial release and did not want to get caught with drugs in his system. *Id.* Ms. McCormick told him that the drugs would be out of his system within two days and Mr. Post agreed to get high. *Id.* Ms. McCormick asked Mr. Post whether he had ever shot up and he said he had not. *Id.* Ms. McCormick then crushed the pill and

placed it in a needle for Mr. Post. *Id.* Mr. Post told Ms. McCormick that he did not like needles and he asked her to inject him, which she did. *Id.* Mr. Post felt an immediate intense high, and immediately wanted more. *Id.* Mr. Post decided to remain with Ms. McCormick because he knew she would provide him with more pills. *Id.* Mr. Post remained high all that night. *Id.*

When they woke up on Monday, January 21, 2013, Ms. McCormick told Mr. Post that she was "sick," which meant that she was experiencing withdrawal symptoms. *Id.* at 2-3. She told him that she needed more pills and they needed to "rip someone off." *Id.* at 3. Ms. McCormick called a woman who was about forty years old and told her that she knew someone who would sell pills. *Id.* The woman came by and picked up Ms. McCormick and Mr. Post and they headed to an apartment. *Id.* Ms. McCormick took money from the woman and went into the apartment; meanwhile, Mr. Post got out of the woman's car, telling her he had to pee. *Id.* When Ms. McCormick emerged from the apartment with the pills, she did not return to the woman's car and instead ran back to her home. *Id.* At the same time, Mr. Post also ran back to Ms. McCormick's apartment. *Id.* Ms. McCormick had obtained two 30 mg pills and she injected half a pill into Mr. Post and used one and a half herself. *Id.* That evening, Mr. Post and Ms. McCormick went to the apartment of one of her friends and they partied, used drugs, and were eventually driven back to Ms. McCormick's apartment for the night. *Id.*

When Ms. McCormick and Mr. Post woke up on Tuesday, January 22, 2013, they were both sick. *Id.* Ms. McCormick spent about an hour and a half sending

9

text messages to find someone to rip off.  *Id.*  She told Mr. Post about a pharmacy robbery that had taken place two Octobers ago and told him, "[t]hat was me."  *Id.* Ms. McCormick informed Mr. Post that she did the robbery with a few friends, got away with it, and that no one else who was involved got caught.  *Id.*  Ms. McCormick asked Mr. Post what he thought about robbing a pharmacy with her and Mr. Post initially responded that she was crazy.  *Id.*  She told Mr. Post that he could get away with a robbery in Augusta because he was not from the area and very few people knew him.  *Id.*  She said that all he would need to do was cover his face and pass a note over the counter.  *Id.*

Ms. McCormick and Mr. Post made a plan to rob the Walgreen's Pharmacy near Memorial Circle in Augusta, close to Ms. McCormick's apartment.  *Id.* at 3-4. The plan was for Mr. Post to rob the pharmacy and run back to Ms. McCormick's apartment with the drugs.  *Id.* at 4.  Ms. McCormick provided Mr. Post with clothing and she wrote out the demand note, using her left hand and holding the pen near the end to disguise her handwriting.  *Id.*  Mr. Post went to Walgreen's but was unable to get his nerve up and he returned to Ms. McCormick's.  *Id.* When he arrived, she said, "You couldn't do it, could you?  You pussied out."  *Id.*  Mr. Post made excuses, saying that his scarf fell down and someone saw his face.  *Id.*

Ms. McCormick suggested they rob the CVS on Cony Circle in Augusta and Mr. Post agreed.  *Id.*  Ms. McCormick called one of her friends and asked him to drive them to CVS to rob it.  *Id.*  She told Mr. Post that the friend was one of the people involved in the pharmacy robbery two Octobers ago.  *Id.*  The friend declined.

*Id.* Ms. McCormick then called Candice Eaton and asked her to drive them, but Ms. Eaton refused. *Id.* Ms. McCormick became upset with Ms. Eaton and "cussed her out" on the phone. *Id.* After they ended the call, Ms. McCormick again called Ms. Eaton and asked her to help them rip someone off, promising to pay her a 30 mg pill. *Id.* This time, Ms. Eaton agreed. *Id.*

Ms. Eaton drove to Ms. McCormick's with a minor, C.P. *Id.* Ms. McCormick told Mr. Post to be sure not to let Ms. Eaton know that they were going to rob a pharmacy. *Id.* She then gave Mr. Post her ski hat for use at the CVS robbery. *Id.* Ms. Eaton dropped Mr. Post off under the bridge and he was told to meet them back there when he was done. *Id.* Mr. Post went into the CVS and nearly backed out, but did not want to return to Ms. McCormick having again lost his nerve to rob a pharmacy, and he handed the demand note to the pharmacy technician. *Id.* After getting the pills, he met Ms. McCormick, Ms. Eaton, and C.P., and reentered the vehicle Ms. Eaton had been driving. *Id.* at 4-5.

Mr. Post handed the CVS bag with the pills to Ms. McCormick and she proceeded to empty the bottles into the bag and throw the bottles out the rear driver's side window. *Id.* at 5. As Ms. Eaton drove the car, Ms. McCormick came upon the bottle with the GPS device and said "Oh shit, it's a tracker!" *Id.* She threw the bottle out of the car window and moments later, when a police car with blue lights on came up behind them, she told Mr. Post to duck down. *Id.* Mr. Post thought they were "done for" but the police car went around them and stopped to retrieve the bottle with the GPS. *Id.*

Ms. Eaton drove on.  *Id.*  She stopped at a convenience store and C.P. went into the store and bought water and spoons so that Ms. McCormick, Ms. Eaton, and Mr. Post could shoot up.  *Id.*  They drove to a boat ramp where Ms. McCormick shot up three 30 mg pills and Ms. Eaton and Mr. Post shot up one 30 mg pill.  *Id.*  After these three shot up, C.P. drove the car because Ms. Eaton was too high to drive.  *Id.*  They went to the room where Ms. Eaton and C.P. were staying and Ms. McCormick divided up the stolen pills.  *Id.*  Ms. McCormick gave all the 5 mg pills to C.P. and divided up the remaining pills among Ms. Eaton, Mr. Post, and herself.  *Id.*

The three of them, Ms. Eaton, Mr. Post and Ms. McCormick, began using the pills.  *Id.*  All four of them went upstairs to see if one of the people in an upstairs apartment, a woman named Caitlyn Bragg, would let them stay with her in Richmond, Maine.[3]  *Id.*  Mr. Post returned to Ms. Eaton and C.P.'s room while the others remained upstairs; the others then left to go to a store.  *Id.* at 5-6.  While Mr. Post was downstairs, a neighbor came by and said that she knew someone who was interested in buying some pills.  *Id.* at 6.  Mr. Post ended up selling this interested person two 30 mg pills for $35 each.  *Id.*

When Ms. McCormick returned and found out that Mr. Post had sold two pills, she became angry with him, told him that she was trying to sell her pills, and that he had taken a buyer from her.  *Id.*  Ms. McCormick demanded half the proceeds of the sale and Mr. Post gave her $35.  *Id.*  The group ultimately proceeded

---

[3]      In the police reports, this person is identified as Caitlyn Bragg.  *See Gov't Ex.* H.  For clarity, the Court has used Ms. Bragg's name.

to Richmond, where they spent the night in Ms. Bragg's home.  *Id.*  Mr. Post used more drugs before going to sleep.  *Id.*

The next morning, word had spread that Mr. Post had committed the CVS robbery.  *See id.*  Caitlyn Bragg wanted them to leave because she did not want the police to find Mr. Post at her home as her boyfriend was on probation.  *Id.*  They drove to Gardiner, Maine and Ms. McCormick gave Mr. Post $20 for a cab ride and told him that he should give her all the pills so that he would not be caught with them if the police stopped him.  *Id.* at 6-7.  Ms. McCormick told Mr. Post that she would sell the pills for him and bail him out of jail.  *Id.* at 7.  Mr. Post kept two 5 mg pills and two 15 mg pills and gave the rest to Ms. McCormick.  *Id.*  Mr. Post was subsequently arrested at his girlfriend's apartment.  *Id.*

### 3.    C.P.'s February 15, 2013 Proffer

FBI agents interviewed C.P. on February 15, 2013.  *Gov't's Ex.* D (ECF No. 39) (*C.P. Proffer*).  C.P.'s recollection of the events of January 22, 2013 coincided with Mr. Post's except for some details.  After Ms. Eaton dropped Mr. Post off just before the CVS robbery, Ms. McCormick directed Ms. Eaton where to go and wait for him.  *Id.* at 2.  C.P. recalled that when the police came up behind the group after the robbery, Mr. Post ducked down; she did not mention that Ms. McCormick told Mr. Post to duck down.  *Id.* at 2-3.  When Ms. Eaton asked Ms. McCormick and Mr. Post what they wanted her to do, Mr. Post replied, "Just drive!"  *Id.* at 3.

She recalled that when the group went to a boat ramp in Whitefield, Maine, Ms. Eaton and Mr. Post each shot up two 30 mg pills and that Ms. McCormick shot

up three 30 mg pills.  *Id.*  Otherwise, C.P.'s recollection of the events in this case generally matched Mr. Post's.

### 4.    Candice Eaton's April 11, 2013 Proffer

FBI agents interviewed Candice Eaton on April 11, 2013.  *Gov't's Ex.* D (ECF No. 39) (*Eaton Proffer*).  Ms. Eaton's recollection of the events also coincided with Mr. Post's; however, she added some detail.  Ms. Eaton recalled that when the police car with blue lights came up behind their vehicle, Ms. McCormick began "freaking out" and she told Mr. Post to duck down below the window.  *Id.* at 2.  It was when Ms. McCormick and Mr. Post were putting the pills from prescription bottles into a CVS bag that Ms. Eaton realized that Mr. Post had robbed a pharmacy.  *Id.*  She said that, as they proceeded to Whitefield, Ms. McCormick told her to stop at a grocery store to get spoons and water.  *Id.* at 3.  When they arrived at the boat landing, she recalled that she shot up two 30 mg pills.  *Id.*  She said that Ms. McCormick was losing patience with Mr. Post because he used to snort drugs and was not used to injecting them.  *Id.*

Ms. Eaton remembered that when they arrived at her apartment, they all went to a back bedroom and that Ms. McCormick divided up the pills, giving ten more 30s to Ms. Eaton.  *Id.* at 3.  Ms. McCormick gave all the "babies" or 5 mg pills to C.P. so she could sell them.  *Id.*  Ms. McCormick then equally divided the remaining pills between Mr. Post and herself.  *Id.*  She also recalled that the next day, Ms. McCormick gave Mr. Post some money for a cab ride and convinced him to hand over his pills so that he would not be caught with them.  *Id.*

14

### 5.   The Augusta Police Reports

With its sentencing memorandum and reply, the Government filed four narrative reports regarding the CVS robbery.  *Gov't Ex.* A, C, G, H (ECF No. 39). Exhibit A is a narrative report of an interview of Mr. Post on January 23, 2013 at the Augusta Police Department; it is consistent with his later proffer.  *Gov't Ex.* A (*Post Narrative*).  This narrative report also describes the initial police interview with Ms. McCormick.  *Id.* at 7.  Ms. McCormick initially denied any involvement and later said that she participated in writing the note and being in the vehicle.  *Id.* She acknowledged that she threw one of the bottles out of the car window, used the drugs at the boat launch, and received some of the pills from the robbery.  *Id.*

Exhibit C is a narrative report of an interview of Ms. McCormick on January 25, 2013 at the August Police Department.  *Gov't Ex.* C (*McCormick Narrative*).  Ms. McCormick admitted that she had participated in the writing of the demand note— other than two words.  *Id.* at 1.  Ms. McCormick said that she did not think Mr. Post would actually rob the Walgreen's.  *Id.*  She said it was Mr. Post who suggested going to the CVS.  *Id.*  She admitted being in the Eaton vehicle when they dropped Mr. Post off and discarding at least one of the pill bottles after he returned.  *Id.*  She said that when Mr. Post returned to the car, he hunched down in the back seat as they drove away.  *Id.* at 2.

Government Exhibits G and H, consisting of two Augusta Police Department narrative reports, were submitted in reply to Ms. McCormick's response.  *Gov't's Am. Ex. List* G (*Eaton Narrative*), H (*Bragg Narrative*) (ECF No. 39).  Government

Exhibit G describes a police interview with Candice Eaton on January 28, 2013 at the Augusta Police Department. *Gov't Ex.* G (*Eaton Narrative*). In general, Ms. Eaton's recollection was consistent with Mr. Post's proffer. *Id.* at 1-2. Ms. Eaton also described what happened at Caitlyn Bragg's apartment the night of the robbery. *Id.* at 2. She said that there was a lot of arguing and that Ms. Bragg did not know what they had done until Kim Robbins, Caitlyn's aunt, called Stephanie to tell her that Anthony's picture was in the news. *Id.* at 2. According to the police narrative, Ms. Eaton described dropping off Mr. Post in Gardiner as "ditching him." *Id.*

Government Exhibit H describes an interview with Caitlyn Bragg on January 31, 2013. During her interview, Ms. Bragg told the police that she was in the car when Anthony Post, Stephanie McCormick, Candice Eaton, and C.P. were given a ride to Gardiner. *Gov't Ex.* H at 1 (*Bragg Narrative*). She confirmed that on the way to Gardiner, she overheard Ms. McCormick convincing Mr. Post to give her all of his pills, telling him that he was going to get caught one way or another, and she also overheard Ms. McCormick tell Mr. Post not to rat her out. *Id.* She saw Mr. Post hand over a bag to Ms. McCormick. *Id.* at 1-2. Finally, she said that Mr. Post was given $20 for a cab ride when they arrived in Gardiner. *Id.* at 1.

## II.  THE PARTIES' POSITIONS

### A.  The Government's Motion

Contending that Ms. McCormick was an organizer, leader, manager or supervisor of the robbery, the Government contends that the Court should apply a

16

two-level enhancement to Ms. McCormick's Guideline calculation under USSG §
3B1.1(c). *Gov't Mem.* The Government argues that Ms. McCormick did more than
merely suggest the robbery. *Id.* at 8-9. It maintains that she exercised control and
authority over Mr. Post by "(1) professing experience with such robberies, (2) stating
that she was not caught after her previous pharmacy robbery, and (3) telling Post
that he would not be caught." *Id.* at 9. It argues that Ms. McCormick (1) suggested
the robberies in the first place, (2) chose the locations of the failed and successful
robbery, (3) provided Mr. Post with clothing; (4) wrote out the demand note, (5)
immediately took the pills from him when he entered the car, (6) instructed him to
keep his head down, (7) demanded and received half of Mr. Post's profits from his
sale of some the pills allocated to him, and (8) demanded and obtained virtually all
of Mr. Post's pills just before sending him on his way. *Id.* at 9-10. The Government
also points out that Ms. McCormick recruited Ms. Eaton to participate in the crime.
*Id.* at 11.

The Government disagrees with Ms. McCormick's view that to receive such
an enhancement, a defendant must coerce or force a hierarchical subordinate to
commit a crime. *Id.* at 10. It emphasizes that the Guideline's language is lead,
manage, or supervise, not coerce or compel. *Id.*

### B.  The Defendant's Response

In her response, Ms. McCormick says that the enhancement should not apply
because "factually, [the Government] cannot meet its burden of proof, and at least
part of its claim fails as a matter of law." *Def.'s Resp.* at 1. Ms. McCormick stresses

17

Mr. Post's own responsibility for the commission of the crime. She notes that he is "no stranger to either drug use and abuse or this kind of criminal activity," observing that he "has used (and abused) prescription pills in the past, and smoked marijuana and crack" and that at the time of the pharmacy robbery, he was "on pretrial release for burglary." *Id.* at 2. Ms. McCormick denies that she overbore Mr. Post's will; instead, she says that Mr. Post "chose to do drugs with Ms. McCormick." *Id.* at 6. She contends that they decided to carry out the robbery because they were both sick from drug withdrawal. *Id.* She contends that "[b]ased on Mr. Post's own admissions, he was a willing participant from the outset." *Id.* at 7. In fact, she claims that Mr. Post and Ms. McCormick jointly devised the plan to walk to the pharmacy, to rob it, and to run back to Ms. McCormick's home. *Id.* at 7. She observes that the Government "has not and cannot establish that Ms. McCormick exercised control over Mr. Post before and during the course of the robbery." *Id.* at 8. To the extent Mr. Post blames her, she urges the Court to discount his story because his "credibility is certainly minimal in regards to any testimony about his use or possession of drugs" and because, given his extensive drug use, it is questionable whether he remembers any details. *Id.*

Ms. McCormick disputes some of the details of her supposed exercise of authority over Mr. Post. *Id.* at 7-8. She agrees that Mr. Post handed her the pills when he reached the Eaton car, but she denies that she demanded them. *Id.* at 7. She disputes whether she told Mr. Post to duck and then says that even if she did so, it was not because she was supervising him but because a police car had pulled

up behind them. *Id.* at 7-8. She denies that she told Mr. Post to leave the group. *Id.* at 8. In sum, Ms. McCormick accuses the Government of presenting a version of events that is "misleading, incomplete, and inaccurate." *Id.* at 9.

Ms. McCormick maintains that the focus should be exclusively on her dealings with Mr. Post as neither Ms. Eaton nor C.P. knew that the robbery was going to take place. *Id.* at 5-12. Pointing out that § 3B1.1 applies only when a defendant is "an organizer, leader, manager, or supervisor of one or more participants," Ms. McCormick refers to the Guideline definition of "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." United States Sentencing Commission, *Guidelines Manual* (USSG), § 3B1.1, comment. (n.1) (Nov. 2012). As neither Ms. Eaton nor C.P. knew that the robbery was about to take place, they were not, in Ms. McCormick's view, criminally responsible for the pharmacy robbery. *Id.* at 11. Accordingly, according to Ms. McCormick, her supposed control over Ms. Eaton and C.P. would not justify the leadership enhancement.

## III. DISCUSSION

### A.    Section 3B1.1: The Guideline Provisions

Section 3B1.1 of the Guidelines provides:

Based on the defendant's role in the offense, increase the offense level as follows:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

USSG § 3B1.1(a)-(c).

The Commentary to § 3B1.1 explains the proper application of this enhancement. First, the Guidelines define "participant":

> A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted.

USSG § 3B1.1, comment. (n.1). Second, the Application Notes clarify that to qualify for this enhancement, the defendant must have "been the organizer, leader, manager, or supervisor of one or more other participants." *Id.* comment. (n.2). Third, the Application Notes explain the distinction between organizer or leader and manager and supervisor, setting forth a number of factors, including (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in the planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. *Id.* comment. (n.4). Fourth, this same application note stresses that "[t]his adjustment does not apply to a defendant who merely suggests committing the offense." *Id.* Finally, the Application Notes state:

20

> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly defined divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

*Id.* comment. (backg'd.).

### B.      Factual Disputes

#### 1.      Overview

At the presentence conference in this case, the parties informed the Court that they wished to obtain a presentence ruling on the § 3B1.1(c) leadership enhancement issue based on based on a stipulated record and written argument. *Minute Entry* (ECF No. 48). The Government "bears the burden of proving facts to justify such an enhancement by a preponderance of the evidence." *United States v. Frankhauser*, 80 F.3d 641, 653 (1st Cir. 1996). Based on these principles, the Court makes the following findings on the facts disputed by the parties.

#### 2.      Stephanie McCormick and Anthony Post's Use of Drugs

The record confirms, as Ms. McCormick stated, that Mr. Post is "no stranger to illegal drugs." *Def.'s Resp.* at 6. Mr. Post's Proffer confirms that this is true and that he had used alcohol, marijuana, and pain killers. *Post Proffer* at 1. Ms. McCormick argues that "[i]t is thus somewhat bizarre to suggest, as the Government does, that Ms. McCormick **caused** Mr. Post to become re-addicted," and disputes that she overbore Mr. Post's will. *Def.'s Resp.* at 6 (emphasis in original). The Court agrees with Ms. McCormick that Mr. Post is responsible for his

own decision in taking drugs with Ms. McCormick during the period before the commission of this crime. *Id.* ("Mr. Post chose to do drugs with Ms. McCormick").

However, the question here is whether Ms. McCormick was able to influence and control Mr. Post. Shortly after Mr. Post met up with Ms. McCormick, she became involved in a drug deal in which she brokered an oxycodone exchange between two other people, receiving a 30 mg oxycodone pill in payment. *Post Proffer* at 2. Returning to her apartment with Mr. Post and the 30 mg pill, Ms. McCormick asked him whether he wanted to get high on the pill. *Id.* Mr. Post initially declined, explaining that he was on pretrial release and did not want to get caught with drugs in his system. *Id.* But Ms. McCormick told him that the drugs would be out of his system in less than two days. *Id.* Mr. Post relented and agreed to get high. *Id.* Next, Ms. McCormick asked Mr. Post whether he had ever injected a drug and he replied that he had not. *Id.* After Mr. Post said that he was squeamish about injecting himself with the drug, Ms. McCormick herself injected him. *Id.*

Even though Mr. Post needed little convincing, these facts, which the Court finds, confirm that Ms. McCormick was able to convince Mr. Post to do things that he initially did not want to do or had no experience doing. Furthermore, as Mr. Post described it, which the Court accepts, the injection of the drug caused him to experience an intense and addictive high, thus making him more vulnerable to influence over the next few days.

### 3.  The Origin of the Idea of the Robbery

Ms. McCormick uses the passive tense and equivocal language to describe who came up with the idea of robbing a pharmacy:

> One of the means that Ms. McCormick and Mr. Post *apparently devised together* was a pharmacy robbery.  The idea *appears to have arisen from discussions between Ms. McCormick and Mr. Post* when "both were sick."  Although *Ms. McCormick may have suggested* that the pair commit a pharmacy robbery, *it does not appear* as though Mr. Post took any convincing or persuading.

*Def.'s Resp.* at 6 (emphasis supplied).

To the extent that Ms. McCormick is arguing that the idea of the robbery was "devised together," the Court disagrees. The Court finds that the idea to rob a pharmacy originated solely with Ms. McCormick, not with Mr. Post.   Ms. McCormick first described her prior success in robbing a pharmacy and told Mr. Post that he could get away with the robbery because he was not known in the Augusta area.  *Post Proffer* at 3.  Mr. Post's initial response was that he thought she was crazy.  *Id.*

### 4.   The Robbery Planning

Ms. McCormick says that both she and Mr. Post planned the two robberies. *Id.* at 7 ("Not only did Mr. Post voluntarily participate, but he was also active in the planning (such as it was) of the robbery").  The Court agrees with Ms. McCormick that the robbery was not well conceived.  But it disagrees with Ms. McCormick that she and Mr. Post participated equally in the planning.  The Court notes that (1) Ms. McCormick, not Mr. Post, said she had committed a prior pharmacy robbery; (2) Ms. McCormick, not Mr. Post, was familiar with the Augusta area and the drug stores in the area; (3) Ms. McCormick, not Mr. Post, supplied Mr. Post with most of the

23

clothing that he wore during the robbery; (4) Ms. McCormick, not Mr. Post, wrote out the demand note; (5) Ms. McCormick told Mr. Post how to commit the robbery (cover face and pass a demand note); (7) Ms. McCormick, not Mr. Post, suggested that they rob the CVS Pharmacy on Cony Circle in Augusta upon the failure of the Walgreen robbery; and (8) Ms. McCormick, not Mr. Post, sought out and convinced Candice Eaton to give them a ride to what turned out to be the robbery.

The Court finds that Ms. McCormick, not Mr. Post, was the primary planner of the aborted Walgreen's and completed CVS robbery.

### 5.   Stephanie McCormick's Influence During the Robbery

The record confirms that Ms. McCormick did not actually enter either Walgreen's or CVS.  Mr. Post did so alone.  Accordingly, the question is how Ms. McCormick influenced Mr. Post to commit the CVS robbery when she was not in the store.  The answer lies in her response to Mr. Post's "losing his nerve" at Walgreen's.  She looked at him, concluded that he had not completed the robbery, and said, "You couldn't do it, could you?  You pussied out." *Post Proffer* at 4.  Faced with her challenge to his courage, Mr. Post said that when he was inside CVS, he thought to himself, "What am I doing?" *Id.*  However, he "did not want to return to [Ms. McCormick] again after lo[]sing the nerve to rob another pharmacy." *Id.*

The Court finds that even though Ms. McCormick was not present at CVS, she influenced Mr. Post to commit the CVS robbery by her earlier response to his loss of nerve at Walgreen's and by her general influence over him.

### 6.   Stephanie McCormick's Instruction to Anthony Post to Duck Down

When Mr. Post was initially interviewed, he said that when he got in the Eaton car after the robbery, Ms. McCormick told him to duck down and he did. *Post Narrative* at 5. During his proffer, Mr. Post did not mention being directed by Ms. McCormick to duck down upon entering the car, but he did recall that Ms. McCormick told him to do so after they saw a police car with flashing blue lights coming up behind them. *Post Proffer* at 5.

Ms. Eaton told the police that after Mr. Post got in the car, he ducked down, and it was then that she realized what he had done. *Eaton Narrative* at 1. She did not mention an order from Ms. McCormick. *Id.* In her Proffer, however, Ms. Eaton said that when the police car came up, Ms. McCormick told Mr. Post to duck down and he did so. *Eaton Proffer* at 2.

C.P. told the police that when Ms. Eaton realized that there was a police car behind them, Mr. Post "ducked in the back seat as the police officer went by." *C.P. Proffer* at 3. She did not mention Ms. McCormick ordering him to do so. *Id.*

The Court finds that the evidence is too equivocal to determine whether Ms. McCormick instructed Mr. Post to duck down when he first entered the Eaton car after the robbery, but it finds that it is more likely than not that she instructed him to duck down and he did so when the Augusta police car came up behind the Eaton vehicle.

### 7.    Stephanie McCormick's Share of the Pills

The parties dispute whether Ms. McCormick directed the others how to split up the pills and what amount she claimed as her share from the pharmacy robbery.

*Gov't's Mem.* at 3; *Def.'s Resp.* at 3-4.  According to the pharmacist, CVS handed Mr. Post eight bottles of pills, but she described the contents of only seven bottles: (1) two bottles contained 200 5 mg oxycodone pills; (2) two contained 113 15 mg oxycodone pills; and (3) three contained 279 30 mg pills.  *Post Narrative* at 1.[4]

### a.    Anthony Post's Statements

Mr. Post said in his initial interview in a police cruiser that he did not want any of the pills and he gave his share to Ms. McCormick to sell for him.  *Id.* at 4.  At the police station, he told the police that Ms. McCormick divided the pills four ways when they returned to Candice Eaton and C.P.'s apartment.  *Id.* at 5.  He said that Ms. Eaton took some pills and that C.P. did not want any, so "Stephanie took her share."  *Id.*  Mr. Post again told the police that he did not want his share of the pills, only money, so Ms. McCormick took his pills with the understanding that she would sell them for him.  *Id.*

During his proffer, Mr. Post said that Ms. McCormick had emptied all the pills into a bag, throwing out the bottles.  *Post Proffer* at 5.  When they arrived at the boat landing in Whitefield, three of them—Ms. McCormick, Ms. Eaton, and Mr. Post—shot up the oxycodone intravenously.  *Id.*  Ms. McCormick shot up three pills; Ms. Eaton and Mr. Post shot up one.  *Id.*  Upon returning to Ms. Eaton's and C.P.'s apartment, Ms. McCormick divided them up, giving all the "smalls," namely the 5 mgs, to C.P. because C.P. wanted to sell them.  *Id.*  The remaining pills, he said, were split evenly among Ms. McCormick, Ms. Eaton, and Mr. Post.  *Id.*

---

[4]    It may be that the eighth bottle, the tracker with the GPS device, contained no pills.

Later, according to Mr. Post, while Ms. Eaton, Ms. McCormick, Ms. Bragg and Mr. Pujols[5] were at a store, Mr. Post encountered the woman who was renting the apartment to Ms. Eaton and C.P. and she asked to buy some pills.  *Id.* at 6.  He sold her two 30 mg pills for $35 each.  *Id.*  When Mr. Post told Ms. McCormick about the sale, she became angry, said that she was trying to sell pills, and demanded half of the proceeds of the sale because he had taken her buyer from her.  *Id.*  Mr. Post gave Ms. McCormick $35.  *Id.*

Finally, after Mr. Post's image appeared on the news, the entire group—Ms. McCormick, Ms. Eaton, C.P., Ms. Bragg, and Mr. Pujols—all went to downtown Gardiner to drop Mr. Post off.  *Id.*  Ms. McCormick told Mr. Post that he should give her all of his pills because he should not be caught with them and he did so, keeping two 5 mg pills and two 15 mg pills.[6]  *Id.* at 6-7.

### b.    C.P.'s Statement

During her proffer, C.P. recalled that when they returned to the apartment she had been staying at with Ms. Eaton, Ms. McCormick dumped the pills on a bed and divided them up.  *C.P. Proffer* at 3.  She remembered that Ms. McCormick gave Ms. Eaton ten 30 mg pills and two 15 mg pills, that she gave C.P. thirty-seven 5 mg pills, and that the remainder of the pills went to Ms. McCormick and Mr. Post.  *Id.*  She confirmed that as Mr. Post was exiting the car in Gardiner, Ms. McCormick

---

[5]      Mr. Pujols is Caitlyn Bragg's boyfriend.  In Ms. Bragg's interview with the police, his name is listed as "Moses Pujos."  *See Bragg Narrative* at 1.  For clarity, the Court uses the spelling in Mr. Post's proffer—Pujols.

[6]      His possession of the two 5 mg pills is odd because, earlier in his proffer, it is stated that all the small pills had all been given to C.P.

told him that he would not want to be caught with the pills and Mr. Post "handed a wad of pills" to Ms. McCormick as he left the vehicle. *Id.* at 4.

### c.    Candice Eaton's Statement

During Ms. Eaton's initial interview, she said that Mr. Post and Ms. McCormick told her that she would receive two 30 mg pills in exchange for helping them rip someone off. *Eaton Narrative* at 1. Ms. Eaton said that when it came to dividing up the pills, C.P. did not take any, Candice received ten, and Stephanie took the rest. *Id.* at 2. She said she was unsure whether Mr. Post received any pills, but that the intention was for Ms. McCormick to sell Mr. Post's pills for him. *Id.*

During her proffer, Ms. Eaton confirmed that Ms. McCormick had agreed to give her one 30 mg pill if she supplied the ride. *Eaton Proffer* at 2. After the robbery, she reported they went to a boat ramp where Ms. McCormick, Mr. Post, and she all got high. *Id.* at 3. She said that when they returned to her apartment, Ms. McCormick divided up the pills. *Id.* She said that Ms. McCormick gave her 10 more 30 mg pills, gave C.P. all the "babies" or 5 mg pills, and divided the remainder equally between Mr. Post and herself. *Id.* She also confirmed that when they dropped Mr. Post off in Gardiner, Ms. McCormick "convinced" Mr. Post to "give her the remaining portion of his pills so that [he] would not be caught with them." *Id.*

### d.    Findings Regarding Division of Pills

The Court finds that Ms. McCormick was the person in charge of dividing the stolen pills. It accepts C.P.'s memory of the division at the Eaton/C.P. apartment as

more likely than not: (1) McCormick gave Candice Eaton ten 30 mg pills (this is consistent with Ms. Eaton's recollection); (2) McCormick gave C.P. thirty-seven 5 mg pills; and (3) that McCormick split the remaining pills between Mr. Post and herself.  The Court accepts C.P.'s recollection because C.P. was the only person among the three who did not use drugs at the Whitefield boat landing and therefore it is likely that her mind was clearer, because C.P.'s recollection is more precise, and because the fact that Ms. McCormick and Mr. Post retained some of the 5 mg pills is consistent with other statements in the record.

### 8.     Anthony Post's Leaving the Group

The parties dispute whether Ms. McCormick jettisoned Mr. Post from the group.  *Gov't Mem.* at 9-10 ("Post willingly left the group at MCCORMICK's suggestion"); *Def.'s Resp.* at 8 ("[T]he Government incorrectly states that Mr. Post left the group at Ms. McCormick's suggestion"); *Gov't's Reply* at 5 ("[T]here is a logical inference that McCormick told Post to leave and, therefore, exercised control over him"); *Def.'s Sur-reply* at 1-2 ("Taken all together, the Government has not shown that Ms. McCormick told Mr. Post to leave town").

### a.     Anthony Post's Statements

During Mr. Post's initial statement to the police, he said that while they were at Ms. Bragg's apartment, they received word from Ms. McCormick's mother that Mr. Post had committed the robbery.  *Post Narrative* at 5-6.  He said that everyone "became nervous at this point especially Stephanie because she realized that she had touched the bottles without gloves."  *Id.* at 6.  He said that "[t]hey left

Richmond" and that "Stephanie gave Anthony $20 and dropped him off at Reny's in Gardiner so he could get a cab." *Id.*

At his proffer, Mr. Post said that after the call from Ms. McCormick's mother, Ms. Bragg realized that the group had been involved in the CVS robbery and wanted them out of her home because her boyfriend was on probation and she did not want the police to find Mr. Post at her apartment. *Post Proffer* at 6. The group was then given a ride to Gardiner, where they dropped him off. *Id.* Mr. Post said that Ms. McCormick gave him $20 for a cab ride. *Id.*

### b.    Candice Eaton's Statements

During Ms. Eaton's police interview, she said that when they got to Ms. Bragg's apartment, there was "a lot of arguing going on between everybody." *Eaton Narrative* at 2. After the call from Ms. McCormick's mother, she said "everyone became nervous." *Id.* She said:

> Cand[i]ce, Stephanie, Anthony and [C.P.] then drove to downtown Gardiner where they dropped Anthony off. They gave him some money for a cab and he took a cab to his girlfriend's apartment. There was some more arguing going on after just ditching Anthony after what he had done.

*Id.*

In her proffer, Ms. Eaton again affirmed that once Ms. Bragg learned that Mr. Post was involved in the robbery, she wanted him "out of her home as soon as possible because [Mr. Pujols] was on probation and she did not want POST being found by the police after he had spent the night at her home." *Eaton Proffer* at 3.

She recalled that the group traveled to Gardiner where Mr. Post "was dropped off" and that Ms. McCormick gave Mr. Post $20 for a cab ride.  *Id.*

### c.     C.P.'s Statements

During her proffer, C.P. recalled that after Mr. Post's mother called him the morning after the robbery, Mr. Post began "freaking out."  *C.P. Proffer* at 3.  Mr. Post's mother told him that she recognized him from the news photos and was going to turn him in.  *Id.*  C.P. heard Ms. McCormick and Mr. Post "arguing about the situation."  *Id.* at 4.  At that point, Ms. Bragg realized that the group had robbed a pharmacy and wanted them out of the house because of her boyfriend's probation.  *Id.*  The group traveled to Gardiner "to drop [Mr. Post] off on their way to Augusta, Maine."  *Id.*

### d.     Findings Regarding Anthony's Leaving

Although the evidence here is not compelling, the Court does not find that it is more likely than not that Ms. McCormick ordered Mr. Post to leave the group. Once the group received word that Mr. Post's photograph was on the news and, indeed, that Mr. Post's mother was going to report him to the police, the immediate impulse for their leaving Richmond was Ms. Bragg.  Although the group was not compelled to split up after leaving Richmond, it was obviously in the best interest of the remaining members of the group involved in the robbery to distance themselves from Mr. Post.  This is particularly true because Mr. Post "thought he was 'screwed' at this point and knew it was only a matter of time before he was caught."  *Post Proffer* at 6.  There was likely a disagreement between Ms. McCormick and Mr. Post

about what to do next and among the group about whether to "ditch[] Anthony after what he had done," but the record is otherwise silent.  The Court does not find that Ms. McCormick ordered Mr. Post to leave the group in Gardiner.

### C.    Legal Analysis

A two-level increase under § 3B1.1(c) is justified only if the Government proves that

> (1) The criminal enterprise involved at least two complicit participants (of whom the defendant may be counted as one), and

> (2) the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of at least one of those other persons.

*United States v. Cruz*, 120 F.3d 1, 3 (1st Cir. 1997) (en banc).

### 1.    Participants

To state the obvious, to be subject to a leadership enhancement, a defendant must lead someone.  To apply a two-level enhancement under § 3B1.1(c), however, a defendant needs to lead only one other person.  *Id.* (the criminal enterprise must involve "at least two complicit participants").  At the same time, to be counted as a "complicit participant," the person must be "a person who is criminally responsible for the commission of the crime."  § 3B1.1 comment. (n.1).  Ms. McCormick objected to the consideration of either Ms. Eaton or C.P. as a participant under this definition.[7]  *Def.'s Resp.* at 9-12.

---

[7]    Ms. McCormick does not contend that C.P. cannot be considered a participant because she was a minor.  *See United States v. Rivera-Maldonado*, 194 F.3d 224, 234 (1st Cir. 1999) ("[T]he contention that minors should not be considered 'participants' under USSG § 3B1.1 is utterly without merit").

Under § 3B1.1, the line dividing "complicit participants" from those who are not falls between "mere 'dupes,'" *United States v. Bey*, 188 F.3d 1, 10 (1st Cir. 1999), and persons who give "knowing aid in some part of the criminal enterprise." *Id.* at 10 n. 9 (quoting *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996)); *United States v. Lewis*, 68 F.3d 987, 989 (6th Cir. 1995). Ms. Eaton and, to a lesser degree, C.P. fit somewhere in between these broad definitional outer boundaries. Most cases in which courts have concluded that the alleged subordinate was not a participant involve people entirely unaware that they are participating in a criminal enterprise. *See United States v. Cyphers*, 130 F.3d 1361, 1363 (9th Cir. 1997) ("mere unknowing facilitators of crimes will not be considered criminally responsible participants"). In *Bey*, for example, the alleged subordinates thought they were transporting rum or wine from Jamaica, when in fact they were carrying "large amounts of cocaine, diluted in bottles of alcohol" and the First Circuit concluded they were not participants under § 3B1.1. *Bey*, 188 F.3d at 3.

Ms. Eaton, who pleaded guilty to being an accessory after the fact, *see United States v. Eaton*, No. 1:13-cr-00062-JAW-001, *Minute Entry* (ECF No. 22), fits snugly within the *Hall* Court's view that an accessory is a participant under § 3B1.1:

> [J]ust as a party who knowingly assists a criminal enterprise is criminally responsible under principles of accessory liability, a party who gives knowing aid in some part of the criminal enterprise is a "criminally responsible" participant under the Guidelines.

101 F.3d at 1178; *see United States v. Braun*, 60 F.3d 451, 453 (8th Cir. 1995); *United States v. Boutte*, 13 F.3d 855, 860 (5th Cir. 1994); *United States v. Lewis*, 68 F.3d 987, 989-90 (6th Cir. 1995).

Viewing the evidence most charitably to Ms. Eaton, when Mr. Post returned to her vehicle with bottles of prescriptive medicine and Ms. McCormick began emptying the bottles into the CVS bag, she became aware that a pharmacy robbery had occurred.  *Eaton Proffer* at 2.  From then on, Ms. Eaton by her own admission was an accessory after the fact, driving the getaway car and taking a share of the stolen drugs.  *United States v. Eaton*, No. 1:13-cr-00062-JAW-001, *Prosecution Version* (ECF No. 19).  During this time, she continued to obey Ms. McCormick's multiple directives: (1) after Ms. McCormick said she needed water and spoons to get high, Ms. Eaton stopped at a store in Whitefield as directed by Ms. McCormick, *C.P. Proffer* at 3; (2) after Ms. McCormick asked C.P. if she knew a place in Whitefield to get high, Ms. Eaton drove to the boat ramp, *id.*; and (3) back in her apartment, Ms. Eaton allowed Ms. McCormick to divide up the pills, dictating her share.  *Id.* at 3; *Eaton Proffer* at 3.  In participating in the aftermath of the conspiracy, Ms. Eaton furthered the criminal activity and is thus a participant within the meaning of § 3B1.1.

It is true that Ms. Eaton did not plead guilty to engaging in a conspiracy to rob the CVS pharmacy.  However, it is "of no matter that the government did not prosecute or convict [the defendant] for her participation."  *Bey*, 188 F.3d at 10.  The standard is not whether Ms. Eaton was convicted for participating in a conspiracy to rob the pharmacy.  *Hall*, 101 F.3d at 1177 ("whether [the defendant] was a co-conspirator is not ultimately dispositive of his participant status under § 3B1.1").

34

Here, Ms. Eaton knew that Ms. McCormick and Mr. Post intended to commit a crime to obtain prescriptive medication and, although she did not have prior knowledge of the details of the crime itself, she was willing to drive them to the scene of a contemplated robbery and to drive them away in exchange for a share of the pills. Thus, even if she did not know that Ms. McCormick and Mr. Post were going to rob a pharmacy, she knew they were going to rob prescriptive drugs from someone. Ms. Eaton's knowledge that she was participating in a crime—before the pharmacy robbery was completed—rose beyond a mere generalized suspicion. *C.f. Lewis*, 68 F.3d at 989 (concluding that women who were aware that "something was suspicious" but did not know a crime was being committed were not participants).

This is enough. *See Judge D. Brock Hornby's 2013 Revisions to Pattern Crim. Jury Instructions for the District Courts of the First Circuit* § 4.18.371(1) (updated Sept. 6, 2013). Judge Hornby's instructions clarify that a conspiracy "does not have to be a formal plan or agreement in which everyone involved sat down together and worked out all the details" and the jury does not need to find "that the defendant agreed specifically to or knew about all the details of the crime . . . but the government must prove beyond a reasonable doubt that she knew the essential features and general aims of the venture." *Id.* Even before the robbery, Ms. Eaton knew the "essential features and general aims" of the people in her motor vehicle were to rob drugs from someone, knew that her role was to provide transportation to and from the scene of the crime, and knew that in exchange for her assistance— once they finished the criminal transaction—she would be paid stolen pills.

35

Tracking Ms. McCormick's orders to Ms. Eaton before the robbery, it is evident that Ms. McCormick was in control of Ms. Eaton. When Ms. Eaton refused to give Mr. Post and Ms. McCormick a ride to a proposed pharmacy robbery, Ms. McCormick "cussed her out" on the phone. *Post Proffer* at 4. After Ms. Eaton refused, Ms. McCormick called her again and prevailed upon her to give them a ride to "help with a rip-off in exchange for a 30." *Id.*; *Eaton Proffer* at 1 ("The two had several heated calls"). Once Ms. Eaton agreed to provide transportation to the "rip-off," Ms. McCormick directed her where to go. *C.P. Proffer* at 2. After the robbery, although it was Mr. Post who told Ms. Eaton to "just drive," Ms. McCormick asked C.P. if she knew of a place where they could get high, directed Ms. Eaton to the boat ramp, and later divided up the stolen pills. *Id.* at 3.

Thus, the Court finds that Ms. McCormick ordered and directed Ms. Eaton's activities leading up to and following the commission of the robbery, and that Ms. Eaton's activities in supporting the general aims of the enterprise are sufficient to constitute participation under § 3B1.1.

### 2. Ms. McCormick and Mr. Post

Mr. Post actually committed the pharmacy robbery and is a participant under § 3B1.1. As the First Circuit explained in *Cruz*, 120 F.3d at 2, for § 3B1.1(c) to apply, "[t]he criminal enterprise [must] involve[] at least two complicit participants (of whom the defendant may be counted as one)." 120 F.3d at 2.

The critical issue is whether Ms. McCormick "exercised control over, organized, or was otherwise responsible for superintending the activities of, at least

one of those other persons." *Id.* Here, the evidence that Ms. McCormick controlled Mr. Post for purposes of the § 3B1.1(c) two-level enhancement is overwhelming:

1) Ms. McCormick, who was 22 at the time of the robbery, is older than Mr. Post, who was 19;[8]

2) Ms. McCormick brokered a drug deal for a 30 mg oxycodone pill within a few hours of their meeting in Augusta, demonstrating her experience with drug trafficking;

3) Ms. McCormick suggested that they get high and after Mr. Post—who was on probation—declined, fearing the drugs would be discovered in his blood stream, she prevailed upon him to use drugs;

4) Ms. McCormick suggested that he inject drugs, something that he had never done before, and when he expressed squeamishness about the needle, she injected him;

5) Mr. Post had a profoundly intense and addictive response to the injection and became more dependent upon her, because he remained leery of needles and she was the one who injected him;

---

[8]     The Court recognizes that age alone is not a sufficient factor to justify a § 3B1.1 enhancement; however, it is a proper consideration.  "While a defendant's having greater experience than another participant may be a pertinent evidentiary factor supporting an inference that a defendant played a supervisory role, relative age and experience, without more, cannot be the basis for an enhancement." *United States v. Frankhauser*, 80 F.3d 641, 655 (1st Cir. 1996).  Here the three year age difference between the two cousins was not extreme, but the Court has considered it as one factor among many in supporting the enhancement.

6) Ms. McCormick engineered a "rip-off" the next morning in which she contacted a drug user and stole the pills that were the subject of the arranged deal;

7) Ms. McCormick assisted Mr. Post in injecting the oxycodone that she had "ripped off";

8) Ms. McCormick suggested the pharmacy robbery and when Mr. Post told her that she was crazy, she prevailed upon him by telling him that she had committed a pharmacy robbery earlier and had not been caught and that he would not be recognized because he was not from Augusta;

9) Ms. McCormick provided Mr. Post with most of the clothing for the proposed Walgreen's robbery;

10) Ms. McCormick wrote out the demand note, which she gave to him to hand to the pharmacist;[9]

11) Ms. McCormick wore gloves to write out the note and passed those gloves to Mr. Post to wear while committing the robbery;

12) Ms. McCormick told Mr. Post how to commit the robbery, that is, just to cover his face and pass the demand note;

13) When Mr. Post lost his nerve and aborted the Walgreen's robbery, Ms. McCormick berated him, telling him that he had "pussied out";

---

[9]     Here, as fact-finder, the Court finds that Ms. McCormick alone wrote the demand note.  It rejects her attempt to distance herself from the note by saying she did not write "start shooting."  The Court examined the handwriting on the note and the handwriting is consistent throughout the note.

14) Ms. McCormick suggested robbing the CVS on Cony Circle in Augusta and Mr. Post agreed;

15) Ms. McCormick recruited other associates, including Ms. Eaton and C.P., in part by berating Ms. Eaton when she had initially declined to participate;

16) Ms. McCormick gave Mr. Post the robbery clothing, including a ski mask;

17) Ms. McCormick directed Ms. Eaton where to drive to drop off Mr. Post and where to remain while he did the robbery;

18) Ms. McCormick's earlier berating of Mr. Post and his reluctance to face her again if he lost his nerve had an effect on Mr. Post while he was inside the CVS and deciding whether to commit the robbery;

19) Ms. McCormick took control of the pills the minute Mr. Post entered the Eaton car after the robbery;

20) Ms. McCormick recognized that one of the bottles had a GPS device and she threw it out the window;

21) Ms. McCormick ordered Mr. Post to duck down when the police car came up behind them and he followed her order;

22) After the group decided to get high and arrived at the boat landing, Ms. McCormick argued with Mr. Post and was losing patience with him because he needed help shooting up;

23) Ms. McCormick divided the pills up among the group, distributing thirty-seven 5 mg pills to C.P., ten 30 mg pills to Ms. Eaton, and splitting the remainder between Mr. Post and herself;

24) As Mr. Post actually committed the robbery while Ms. McCormick remained in the car, the equal division of pills is evidence that Ms. McCormick was directing Mr. Post;

25) When Mr. Post sold two of his own 30 mg pills to a customer for $35 each, Ms. McCormick became angry with him and demanded half of the proceeds from Mr. Post for the sale of his own pills and Mr. Post gave her half the proceeds;

26) Ms. McCormick gave Mr. Post twenty dollars to get a cab when he left the group; and

27) Ms. McCormick demanded and received all of Mr. Post's remaining pills when he left the group in Gardiner.

These facts, each of which the Court finds, paint a compelling picture that Ms. McCormick was in control and that Mr. Post was following her lead throughout the planning for and execution of the pharmacy robbery and throughout the post-robbery events.  Ms. McCormick repeatedly exercised decision-making authority, participated in the events from beginning to end, recruited associates, claimed an equal share of the proceeds with the person who actually committed the robbery, doled out the proceeds to the other participants, planned and organized the crime,

and controlled the activities of the people she recruited.  USSG § 3B1.1(c), comment. (n.4).

## IV.   CONCLUSION

Based on its findings, the Court concludes that the Government has established that it is more likely than not that Stephanie McCormick was the organizer, leader, manager, or supervisor of both Anthony Post and Candice Eaton in the pharmacy store robbery of January 22, 2013 and the Court will apply the two-level enhancement under § 3B1.1(c).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 18th day of November, 2013